## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-693

BEN DIEHL AND CHRISTINE DIEHL

Plaintiffs,

v.

LIBERTY MUTUAL PERSONAL INSURANCE COMPANY,

Defendant.

_____

## COMPLAINT AND JURY DEMAND
_____

Plaintiffs, Ben Diehl and Christine Diehl, by and through their attorneys, The Roth Group, respectfully submit the following Complaint against Liberty Mutual Personal Insurance Company as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiffs, Ben Diehl and Christine Diehl ("Plaintiffs") are citizens of and domiciled in Boulder County, Colorado.

2. Upon information and belief, Defendant, Liberty Mutual Personal Insurance Company("Defendant") is a foreign corporation organized under the laws of Massachusetts, is authorized to do business in Colorado and is doing so by, among other things, insuring Plaintiffs' Property located in Colorado.

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a), as there is diversity of citizenship amongst the parties and the amount in controversy exceeds $75,000, inclusive of interest and costs.

## GENERAL ALLEGATIONS

4. Plaintiffs are the owners of certain real property and improvements, including, without limitation, a residence, located at 921 Saint Andrews Lane, Louisville, CO 80027 (the "Property".

5. Defendant issued Policy Number H3V-291-843123-40 1 7 (the "Policy") to Plaintiffs.

6. The Policy is a Residential Policy that covered, inter alia, all risks of sudden and accidental direct physical loss or damage to the home and other structures located at the Property, including property damaged by fire.

7. On December 30, 2021, a fire broke out that would become the most destructive fire in Colorado history, regarding how many structures were destroyed. This event came to be known as The Marshall Fire

8. The Marshall fire took the lives of two people and burned 6,026 acres, destroying 1,084 buildings, the majority of which were residential homes.

9. Plaintiffs' Property and home was destroyed along with all but two of the homes on Saint Andrews Lane, sometime in between December 30, 2021, and January 1, 2021 (the "Loss").

10. Plaintiffs immediately filed a claim with Defendant and Defendant assigned claim number 048037578-01 (the "Claim").

11. At the time of the Loss, the declarations page of the Policy indicated that Plaintiffs had a policy limit of $355,300 for the "Dwelling with Expanded Replacement Cost" coverage; $35,530 for "Other Structures on Insured Location" coverage; and $266,480 for "Personal Property with Replacement Cost" coverage.

12. Defendant conducted a remote inspection of the Property on or about January 6, 2022.

13. Following this remote inspection, Defendant stated that the following amounts would be paid: $383,724 for coverage A with inflation protection added in; $19,186.20 for Trees/Plants/Shrubs; $38,372.40 for Coverage B.

14. Defendant further stated that the following amounts would be paid when incurred: Coverage A had an additional 20% ($76,744.80); Trees/Plants/Shrubs had an additional 20% ($3,837.24); Dwelling Debris Removal of $19,186.20 plus and additional 20% ($3,837.24); and Code coverage of $38,372.40 plus and additional 20% ($7,674.48).

15. On or about January 20, 2022, Defendant emailed Plaintiffs indicating that the initial evaluation was complete and a check was being sent to Plaintiffs.

16. Defendant further stated in that email:

    "Expanded/Extended Dwelling Coverage Funds"

    Your policy does provide additional coverage for the rebuild of the home (if the expense is required to replace the home). Currently, we are

        completing a detailed valuation/estimate for the necessary cost to rebuild the home. Once this is complete, the field representative or I will follow up with you to discuss how this may impact the funds approved for the rebuild/replacement of the home.

17. No further "detailed valuation/estimate" was ever provided to Plaintiffs following this email.

18. The Policy contained the following "Inflation Protection Endorsement":

> **INFLATION PROTECTION ENDORSEMENT**
>
> It is agreed that the limits of liability for:
>
>     Coverage A, Dwelling;
>
>     Coverage B, Structure;
>
>     Coverage C, Personal Property;
>
>     and Coverage D, Loss of Use,
>
> shall be raised by the rate of increase in the latest available information on residential building cost inflation.
>
> **METHOD**
>
> To find the limits of liability on a given date, the Index Level the Company assigns to that date will be divided by the Index Level for the effective date of this Endorsement. This Factor is then multiplied by the limit for Coverages A, B, C and D separately.
>
> If during this policy's term the Coverage A limit is changed at the insured's request, the effective date of this Endorsement is amended to the effective date of such change.
>
> This Endorsement shall not reduce the limits of liability to less than the amount shown on:
>
>     a.  The policy; or
>
>     b.  The most recent Homeowners Policy Renewal Declaration.
>
> This Endorsement must be attached to Change Endorsement when issued after the policy is written.

19. On or about February 23, 2022, Plaintiffs emailed Defendant regarding the "Inflation Protection Endorsement" and asked the following questions:

    1) What is the source of the Index Level that is referenced? Is this publicly available and/or published somewhere?

    2) Can you provide the Index Level for 12/30/21 and also for the effective date of the Endorsement, 4/17/20?

    3) What is the definition used for residential building cost inflation?

20. After not receiving a response from Defendant, Plaintiffs again sent an email to Defendant on or about March 31, 2022 providing their assessment of the "Inflation Protection Endorsement" stating:

    Here is my assessment of our policy, the Inflation Protection Endorsement (FMHO-2835 11 03) and the Liberty Mutual policy distributions to date:

> 1. The Inflation Protection Endorsement clearly states: "The limits of liability shall be raised by the rate of increase in the latest available information on residential building cost inflation."
>
> 2. The calculated value that Liberty Mutual determined for the Inflation Protection Endorsement is 7.41%.
>
> 3. Based on readily and publicly available information, residential building cost inflation rate for 2021 in Boulder County, Colorado is significantly higher than the 7.41% Liberty Mutual is claiming is the inflation adjustment as provided under the Inflation Protection Endorsement.
>
> I'd like to request you and the Liberty Mutual team re-assess the policy's limits of liability and raise the respective limits by the actual latest available residential building cost inflation rate of increase. Please advise at your earliest convenience.

21. Later that same day, Defendant's adjuster, Kent Stiles, responded that he was needing a decision from "management to request clarity."

22. After still not receiving an answer to their questions, Plaintiffs again emailed Defendant on or about April 20, 2022 following up and requesting the contact information of Mr. Stiles' manager.

23. Mr. Stiles responded that he had the information and was drafting an email.

24. On or about April 21, 2022, Defendant provided the following in response to Plaintiffs' February 23, 2022 email:

> Dear Mr. Diehl – Thank you for your emails as well as your patience while additional information was gathered regarding your questions. The balance of this email will serve to answer questions that were posed in two separate emails as well as notification of your plans with regards to the necessary debris removal at your property.
>
> In regard to the Inflation Protection Endorsement (FMHO 2835 (Ed. 11/03)): 1) "What is the source of the Index Level that is referenced? Is this publicly available and/or published somewhere?"
>
> ANSWER: The policy limit rate increase is predictive and locked in at the time of renewal. Once the premium is received for the policy, the insured has agreed to the terms and conditions of the renewal and policy provisions, for the twelve-month term. Liberty Mutual does not disclose proprietary methodologies, including but not limited to methodologies pertaining to what factors may go into the Index Level it assigns to the Endorsement.

2) "Can you provide the Index Level for 12/30/21 and also for the effective date of the Endorsement, 4/17/20?"

ANSWER: The full year index level in December, 2021 was 1.12. This is pro-rated based upon the time that has passed from the renewal to the date of loss. In the case of your claim, the policy renewed on April 17, 2021 and the date of loss was December 30, 2021. The increase in the policy limit totaled approximately 8%.

3) 'What is the definition used for residential building cost inflation?'

ANSWER: The policy does not include a specific definition for 'residential building cost inflation."

The foregoing is not intended to waive any defenses which are now, or which may hereafter become available to us. The foregoing does not constitute a waiver of any term, condition, or exclusion of the insurance policy or any rights and defenses under the policy, and we hereby expressly reserve all of our rights and defenses thereunder.

25. Nowhere in the Policy is it stated that the "Inflation Protection Endorsement" is locked at the time of renewal. Defendant's statement is in direct conflict with the language in the "Inflation Protection Endorsement" which states that policy limits are to be "raised by the "latest available information".

26. Plaintiffs sent Defendant a letter on or about June 1, 2022 pointing out the conflicts in the "Inflation Protection Endorsement" and providing multiple examples of "Residential Building Cost Inflation", all of which were far in excess of the percentage applied by Defendant.

27. Plaintiffs requested that Defendant re-evaluate its calculation of "Residential Building Cost Inflation" and provide a response to their June 1, 2022 letter within three weeks.

28. Defendant responded Plaintiffs' June 1, 2022 letter on or about June 27, 2022 stating:

Good morning Mr. Diehl –

I hope you and your family are doing well. I wanted to follow up with you this morning regarding the letter that you sent on June 1, 2022, specifically requesting that Liberty Mutual re-evaluate its calculation of the residential building cost inflation calculation on your policy (H3V29184312340). I had a discussion with management and others who have additional information regarding the 'Inflation Protection Endorsement' that is included within your policy. I met will all involved parties the week before last and hoped to have a response to you prior to me leaving the office for the week (last week) but had not yet received the necessary detail/information prior to leaving on 6/17. I returned to the office today and was provided with additional information that I felt was necessary to explain the process for applying the inflation calculations.

> As mentioned in the prior correspondence, Liberty Mutual's model for calculating increases under the 'Inflation Protection Endorsement' is proprietary; however, the factors impacting this calculation are based on the CoreLogic Residential Component Technology (RCT) index, which measures the cost to rebuild a typical home in various geographic regions.
>
> When your policy renewed in April 2021, the Inflation Protection factor applied was 1.021 and resulted in an increase of the Coverage A limit to $355,300 from $348,000. In December 2021 when the loss occurred, an additional adjustment of 1.08 was applied to account for inflation between the policy renewal date (April 17, 2021) and the date of loss (December 30, 2021). This supplemental amount resulted in an increase of the Coverage A limit to $383,724 from $355,300. In total, a 10.1% increase was applied to Coverage A limits to account for inflation in the past year.
>
> Liberty Mutual Personal Insurance Company has reviewed the request to re-evaluate the calculation used for determining the residential building cost inflation amount under the 'Inflation Protection Endorsement.' At this time, Liberty Mutual Personal Insurance Company's position on the amount available for the rebuild of the home remains unchanged. The funds available under the 'Inflation Protection Endorsement' have been approved in conjunction with the policy provisions and will not be increased at this time.
>
> If you have any additional questions related to the above items, please let me know. The foregoing is not intended to waive any defenses which are now, or which may hereafter become available to us. The foregoing does not constitute a waiver of any term, condition, or exclusion of the insurance policy or any rights and defenses under the policy, and we hereby expressly reserve all of our rights and defenses thereunder.

29. On or about July 6, 2022 Plaintiffs emailed Defendant requesting the CoreLogic Residential Component Technology report.

30. On or about July 15, 2022, in response to a request from Defendant regarding Plaintiffs' rebuilding plans, Plaintiffs again requested the CoreLogic Residential Component Technology report.

31. On or about August 5, 2022, Defendant emailed Plaintiffs in response to Plaintiffs' request for the CoreLogic Residential Component Technology report and stated:

> Dear Mr. Diehl –
>
> I hope you are doing well. I was able to get information back from our actuarial department and it was advised that we are limited on the extent information we are allowed to release. At this point, this is the extent of what has been provided to me and what I have to pass along to you.

> It was advised that we calculate IPP factors as the year over year change in CoreLogic's Residential Component Technology (RCT) index for each individual state, capped at 12%. To arrive at the additional 1.08 adjustment-
>
> December 2021 Core Logic Residential Component Technology Index (Colorado): 4828
>
> December 2020 Core Logic Residential Component Technology Index (Colorado):4297
>
> (4828/4291) – 1 = 12.5%, capped at 12%
>
> This is the factor that would have been for renewals effective in December 2021. Since the policy was renewed in April, 2021, this factor gets prorated to represent the amount of inflation that occurred in between the renewal and the loss in December, 2021 (12% * (8/12) = 8%).

32. There is no language in the Policy indicating that there is a cap on the "Inflation Protection Endorsement".

33. Further, Defendant response contradicts its earlier assertions that the "Inflation Protection Endorsement" is locked at the time of renewal.

34. Plaintiffs again requested that Defendant reevaluate its position. Defendant refused.

35. A common theme of the victims of the Marshall Fire is an overwhelming majority of the homeowner victims were underinsured.

36. Inflation was often cited as the cause of this underinsurance problem.

37. Plaintiffs purchased a Policy with Defendant that included an "Inflation Protection Endorsement" that provided for increases in coverage consistent with "Residential Building Cost Inflation" as outlined in Paragraph 18 of this Complaint.

38. Any reasonable insured would believe that they were protected from inflation based on the language of the "Inflation Protection Endorsement".

39. Based on Defendant's assertions to Plaintiffs and explanations regarding the "Inflation Protection Endorsement", the "Inflation Protection Endorsement" is ambiguous and therefore falls in the favor of coverage for the insured.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

40. Plaintiffs incorporate the foregoing paragraphs of their Complaint as if fully set forth herein.

41. The Policy creates a contract of insurance.

42. By its actions, through not fully paying Plaintiffs' claims under the Policy, Defendant breached the contract of insurance.

43. As a direct and proximate result of said breach, Plaintiffs are entitled to damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Bad Faith Breach of Insurance Contract)

44. Plaintiffs incorporate the foregoing paragraphs of their Complaint as if fully set forth herein.

45. Defendant owed duties to Plaintiffs under the Policy's implied covenant of good faith and fair dealing, wherein it covenanted that it would, in good faith, and in the exercise of fair dealing, deal with Plaintiffs fairly and honestly, faithfully perform its duties of representation, and do nothing to impair, interfere with, hinder, or potentially injure Plaintiffs' rights to receive the Policy's benefits.

46. Defendant acted unreasonably and breached its duties of good faith and fair dealing by its actions, which included, without limitation, the following unreasonable acts:

    a. Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;
    b. Failing to provide a basis for its claims decisions or why certain policy coverages are not being paid.
    c. Failing to properly investigate and evaluate Plaintiffs' claims for Policy benefits;
    d. Failing to pay Plaintiffs the full benefits owed under the Policy;
    e. Failing to pay amounts under the Policy in a timely manner;
    f. Failing to effectuate a prompt, fair, and equitable settlement of Plaintiffs' claims;
    g. Failure to give equal consideration to Plaintiffs' rights and interests as it has given its own interests;
    h. Depriving Plaintiffs of the benefits and protections of the contract of insurance;
    i. Compelling Plaintiffs to institute litigation in order to recover amounts due under the Policy; and
    j. Other conduct to be revealed through discovery.

## THIRD CAUSE OF ACTION
### (Violation of C.R.S. §10-3-1115 and Relief Pursuant to §10-3-1116)

47. Plaintiffs incorporate the foregoing paragraphs of their Complaint as if fully set forth herein.

48. C.R.S. §10-3-1115 forbids an insurer from unreasonably delaying or denying payment of a claim for benefits owed to or on behalf of a first-party claimant.

49. Plaintiffs are first-party claimants under C.R.S. §10-3-1115.

50. Defendant has denied Plaintiffs' claim without a reasonable basis within the meaning of C.R.S. §10-3-1115.

51. C.R.S. §10-3-1116 provides that a first-party claimant whose claim has been unreasonably delayed by an insurer may bring an action in Colorado district court to recover reasonable attorneys' fees and court costs and two times the covered benefit.

52. Because Defendant's actions, as described above, violate C.R.S. §10-3-1115, Plaintiffs bring this claim to recover their reasonable attorneys' fees and court costs and two times the covered benefit, as allowed under C.R.S. §10-3-1116.

WHEREFORE, Ben and Christine Diehl respectfully request that judgment be entered in their favor and against Liberty Mutual Insurance Company as follows:

a. For compensatory damages, both economic and non-economic, in amounts to be proved at trial;
b. For double damages pursuant to statute;
c. For all prejudgment interest, statutory or moratory, and post-judgment interest allowed by law;
d. For reasonable attorneys' fees and costs of suit herein; and
e. For such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury.

Dated this 17th day of March 2023

                                              Respectfully submitted,

                                              THE ROTH GROUP

                                              By:   */s/ David M. Roth*
                                                      David M. Roth, #44800

                                              ATTORNEYS FOR PLAINTIFFS
                                              BEN AND CHRISTINE DIEHL